Good morning, your honors. May it please the court, Diane LaTarte for the appellant, which is Mr. Jennings. Mr. Jennings has been incarcerated over 20 years. He was sentenced to a life without possibility of parole. There was five co-defendants in this case. Three of the co-defendants received a death penalty. Mr. Jennings received the life without possibility of parole, and there was a fifth co-defendant that received 25 to life. In this case, Mr. Jennings has been appealing his case in the state court for over seven years, and while he was appealing in the state court, the Lilly case came down. In the Lilly case, what basically would happen, the lower the court of appeal in the California Supreme Court case basically told the court of appeal, in light of Lilly, you may want to take a second look at this. The court of appeal looked and in the basically didn't change anything, and Mr. Jennings was left without any remedy. But what do you mean by they didn't change anything? I mean, you mean they didn't change their analysis? They didn't change the result? What do you mean by that? They didn't change their result. And so from there, Mr. Jennings appealed over to the court. All right. We know all that. Can we get to the merits of the issue? Okay. Okay. I believe there's four different issues that we'd like the court to hear. And one of them was the confrontation clause issue. Well, that seems to be the big issue in the case. The district court spent about 80 pages analyzing in agonizing detail each statement and gave your client essentially the benefit of the doubt on finding a confrontation clause violation in several instances, and nonetheless concluded that those errors were harmless. Would you specifically say what is erroneous about the district court's analysis? Well, in the statements, the reason that the U.S. district court stated that it was a harmless error is because they said given that this was a felony murder case, the intent was implied by the robbery and the burglary. Correct. That they didn't have to prove his specific state of mind to kill someone. Correct. Right. And I think the case has multiple issues besides the fact that there was a confrontation clause. Basically what's the issue? Yeah. Go ahead. Oh, I'm sorry. As I understand the problem, it's whether you're pretty much conceding and even pretty much conceding the trial, the robbery, the burglary and the felony murder. And the question is whether the mental states were established for special circumstances. Right. And that the district court didn't really put its focus there. Correct. The multiple issues on the state of mind came through these out-of-courts, these co-defendants' statements, and in addition, I think the U.S. district court mentioned the erroneous jury instruction that basically omitted an element of intent to kill. But you haven't appealed with respect to the jury instruction. Pardon me? I don't see the jury instruction as one of your issues in your opening brief. You have confrontation clause, you have due process, you have evidence for special circumstances, you have sufficiency of evidence, but there wasn't in the opening brief, I think, a separate claim that there was an erroneous jury instruction. This was on the fourth issue with the lying in wait. Wasn't that the issue you prevailed on? You prevailed on a jury instruction question. Yes, we did. And the State didn't cross-appeal on that. Pardon me? The State did not cross-appeal. Is there another jury instruction issue? I'm just confused. Is there another jury instruction issue other than the lying in wait instruction on which you prevailed? No. That's the one you were just referring to. Correct. So you didn't appeal it because you won. Correct. And they didn't appeal it, so we didn't. Okay. So there is a statement in the State court opinion that you weren't contesting that he had the intent to kill. Is that right? Correct. It's correct? Then doesn't the whole case go away? Pardon me? Doesn't the whole case go away if you were not contesting that he had intent to kill? Oh, I'm sorry. I didn't hear your question. The whole case is there was no intent to kill on Mr. Jennings' side. There was just a lot of evidence that came through through the co-defendants' declaration against interest that came in. And there was we're not sure how the jury came up to the fact that there was an intent to kill. Mr. Jennings was one of the five co-defendants. He wasn't really there inside in the store when they did the killing. When they went in, he ended up being cold feet, got out of there. I can't do this. So he was a lookout for them. He never provided any instrument for the killing. He never went back and said, let's take advantage of this, and the guy is dead, and we're going to go in and do more robbery. And I think Mr. Jennings was just on the outside peripheral of this, that he never conceived the intent to kill. All right. So what the confront we've been very vague about this. The Confrontation Clause statements seem to be of two varieties. One are these somewhat general statements about we all knew we were going to kill him, or we all knew we were going to have to kill him, and everyone there knew that and so on. And then there was a couple of specific statements by Travis, I believe, that Matt had the crowbar and Matt was going to hit him with the crowbar. Correct. And so we've been proceeding so far assuming that those were Confrontation Clause problems clearer with regard to the second ones than the first. But how can you tell us specifically what else there is in the record that would go to the intent and why they're not sufficient to make those admissions harmless? My understanding is that there was a statement by Tipton about what her boyfriend had said. Correct, Your Honor. Tipton. And there were, I suppose, some inferences from just the circumstances how could they have done this without killing him. Is that basically it? What other evidence was there of Matt's intent? There wasn't. The intent, the State was trying to prove, and the intent came in through Tipton, which testified, number one, she didn't like Jennings, and she said she overheard something in regards to their playing a robbery, and then she didn't hear personally about the intent to kill. She said she heard Mr. Robert Standard say, well, so she's testifying in court that she heard them that they were going to do a robbery, and she heard Mr. Standard say that, and they're going to, and they're doing robbery and killing. And Standard said he didn't say that. Pardon me? Standard on the bench said he didn't say that. Correct. Mr. Standard came back on the bench and said, I never really said that. So that would have even been double hearsay. And what about leaving aside intent, though, the second possibility would be a reckless disregard mantra. Correct. The two-pronged test that we have is whether there was a major participant with a reckless disregard for human life. And there's a series of cases on what's a major participant. And I think several cases speak about how do we define major participant. And there's some case law that says, well, we just take the generic what does a major mean, and then there's other case law that kind of narrowed down the definition. But it looks at major participant. You look at, well, you had five co-defendant. You had the fact that he didn't bring anything to the ‑‑ he didn't have any of the weapons. Of the ‑‑ Without the statements, he didn't have a weapon. Pardon me? Without these statements, he didn't have a weapon. I'm sorry. I said without these statements, he didn't have a weapon. With the statements, he didn't have a weapon. Correct. Correct. Correct. In ‑‑ I lost my train of thought. I'm sorry. On the five co-defendant, let's see, the ‑‑ Without the statements, is there any evidence that he knew that other people had weapons? Other than that he went in with them and they said they had weapons. I mean, there's testimony about a crowbar, which is awfully adverse to my client, but it was never used. The major ‑‑ the two‑pronged test for that was the major participant with the reckless disregard for human life. And there's certain factors to look at, which was there was one of five of them, and there was also the fact that he didn't carry, oh, the major participant, whether he was a ringleader. The only testimony that said he was a ringleader was basically from Tipton. And how do you decide that he was a ringleader? Well, he knew these folks from his childhood. I knew where I was going. The other co‑defendants that planned this, they used to work for the store. The two co‑defendants worked at the store that they robbed. And while they were working there, at some point it got terminated, and they wanted to ‑‑ they made the intent there that they wanted to go in and get money. And that's my specific question. There is a statement in the record that Matt siphoned gas from Spencer's car and that they were going to use the gas to blow up or to burn the place. That statement doesn't seem to have been challenged as a Confrontation Clause problem. Am I wrong about that? You mentioned it. I don't understand why. You're correct, Your Honor. Is there a reason? Or was it just somebody screwed up along the way? I'm not sure. Counsel, you have exceeded your time. And we understand your position, and we'll hear from the State now. Okay. Thank you. Morning, Your Honor. May it please the Court. There are a lot of conversations going on in this case. Could you identify yourself for the record, please? I'm David Rose from the California Attorney General's Office. Thank you. Thank you, Your Honor. There are a lot of voices in this case. Technically, we should be reviewing the California Court of Appeals opinion since it's an ADP-8 case, but we can't. I'm having a hard time hearing you. Pull the mic up to your mouth. Thank you. Technically, we should be reviewing the California Court of Appeals opinion in this case. Well, the California Court of Appeals opinion, if I may, doesn't make a lot of sense. For one thing, it seems to do some sort of a balancing test with regard to what's exculpatory and what's inculpatory. And it concludes, for example, that the statement that Matt had a crowbar and he was supposed to use it is not inculpatory. Is that a defensible conclusion? I think it is. Really? How? Let me make a couple points and maybe it will begin to make some more sense. The point is we're back under the law of Lilly. We're not under Crawford in this case. We're back under Lilly. I understand that. And Lilly is a trustworthiness evaluation. The question is, under Lilly and under Hernandez, yes, these three quotations are inculpatory. It's a trustworthiness with a heavy presumption that a co-defendant's statement inculpating the ---- someone else is not trustworthy and maybe you can then recognize that maybe there are circumstances under which it is, but the presumption is it isn't. And the court of appeals found this was the case, because these three co-defendants didn't really find that. Well, it didn't really find that. It found it wasn't inculpatory. I think it found something else as well. I think it found it trustworthy. I think it found that the three co-defendants confessed. Where's that? Could you show me that, please? Do you want me to look it up right now? I can't put my finger on it, but it's certainly in our brief. I thought that it was saying that it wasn't. No, but I think the court of appeal found, first of all, that there was no reasonable likelihood for most of the ---- let me start back a step. The main proof in this case was that these four guys, the gang of four, these four co-defendants, did everything together. They robbed stores together. They played with tasers together. They did drugs over at Cynthia Tipton's Flophouse together. They talked about everything together. They broke into cabins in the hills above San Jose together. They trashed the cabins, lived there, committed more robberies. After the crime, they shared the loot together. The next day, they went out and all bought cars together. There was no question in this case that Appellant and these other three cohorts, this gang of four, did everything together. And the prosecution's main thrust was what any one of these guys knew, all four of them knew. Everyone who knew them said, if you see one, look around. You'll see the other three. They're all there. Kagan. Isn't what the court of appeals did precisely inconsistent with Supreme Court precedent that says you don't look at the statement as a whole, you look at particular statements? Their ultimate conclusion is, as to the Travis statement, it was more exculpatory than inculpatory to the defendant, although it demonstrated that defendants' participation in crimes tended to lessen the gravity of that participation. But that's looking in context, and the whole case law is you don't look in context. You look at the particular statement. The particular statement here was Matt had a crowbar and he was supposed to use it. And he didn't use it. And he didn't use it. So what? But the question is intent. The issue here is did he have the intent to go in there and use violence, or was he in reckless disregard of human life? Right. So clearly, if he had a crowbar and was meant to use it, then that is way stronger than anything else in the record indicating that he was at least in reckless disregard. No? May I disagree with you on that point? I think that that's certainly a good point. But there are two things we're talking about at the same time now. We're talking about the trustworthiness of the statements, and we're talking about the thrust of the evidence to show that Appellant had knowledge that this was a murder and not just a robbery, or that it was a serious crime. Well, that goes to the harmlessness. Exactly. But first, I still maintain that the overall trustworthiness of the stance of the confessing co-defendant is crucial. Here, these three co-defendants conversationally confessed individually to capital murder. Each one individually thoroughly confessed to all the elements of the murder. After a while, after first denying things and also after. After about 10 minutes. And also saying, well, I only stabbed him once when, if you add all of the stabs to it, I only stabbed him twice or three or four when there were really 40. And I mean, there were obvious – and also, this is, to me, very important. Travis was the one who said that Matt had the crowbar, right? But other people said Travis had the crowbar. Isn't that a classic shifting of responsibility? No, because everyone admitted that Travis, including Travis himself, in his confession admitted that he stabbed the victim to death. But he also said he also – his story seemed to be, I did, but only at the end, and I didn't have a weapon, and I didn't have the crowbar, while other people are saying he had the crowbar. Travis confessed to capital murder. He said he helped stab him. He said he planned the thing. It doesn't matter if he stabbed him, because Travis thoroughly admitted that he planned with the other three guys, at least the other three. We say that the confessions only regarded those three, but with the other four guys. Travis said, I planned this murder. I know – I worked there. Matt didn't do me. Of course I had to kill him. Do you think that Travis knew when he said all this that he was confessing to capital murder? He knew what he was – I mean, on that theory, any confession by somebody is going to be sufficient to overcome any inculpatory notion to somebody else, because the whole premise here is that this is against their penal interest. I think you have to weigh the issue of reliability, as the courts, as Lillian Hernandez say. Lillian Hernandez say you have to – in Lillie and Forn, the defendants were trying to curry favor with the police. They were minimizing their own culpability. They were trying to shift blame to somebody else and say he was more guilty. These guys weren't shifting anything. They were saying, I planned. Each one said, I planned to murder Madden. I went in there to rob and murder Madden. And oh, by the way, Matt had a crowbar, but he chickened out, and he left halfway through, which is why the defense wanted most of those statements of the robbery. Well, they only wanted it after it came in, after the statement. No, they wanted it. Just a minute. They only wanted it after it was ruled that the statement that he was in the building was going to come in. Then they wanted it. I'm not sure that's true. They wanted – the defense knew he was going to get convicted of first-degree murder. The defense knew that from the outset. The evidence was overwhelming that these four guys did everything together. That appellant confessed to three separate people who testified at trial that he did it. He called them from jail the day after, said, I'm sorry, I did it. I committed the robbery. I apologize. He was guilty of first-degree murder. There was no question about that. The defense thrust here was to try to get the jury in sympathy, not to give him the special circumstance. That was the whole point of the defense strategy at trial. That's why the defense said, yes, let the statement – part of the statements in that say he came into the building, but then he chickened out, he got cold feet, and he went back out to the car, started the car for our getaway, which makes him wholly guilty of first-degree murder. But let those statements in, but keep the statements about intent out. That's what the defense wanted. They wanted to keep the intent, the proof of his intent. Our two points would be, let's leave aside and let's say that there was a compensation clause violation. We've thoroughly discussed in our brief why we don't think that that's necessarily true, and why we think that the California Court of Appeals is reasonable in thinking that overall the thrust of these guys' confessions was so horribly self-incriminating and the spreading of blame to Appellant was so minimal that, as a whole, under Lilley and Hernandez, the statements were trustworthy and can come in as a whole. But even the district court below admitted that the parts of the statements that just said as to Travis, Silvera, Silveria, and Spencer, I did it, I planned the thing, that would come in. That would come in along with Appellant's confessions, along with the fact that these guys did everything together, along with the fact that Appellant knew that Spencer and Silveria had worked there and so obviously had to kill Madden. There were no disguises here. Their getaway plan was, we'll go home afterwards. Everybody knew where they were. If they robbed Madden and went home afterwards, they would have got caught in 10 minutes. Kagan. They also took the air out of his tires, which suggested that they thought it was going to be alive and they were trying to not let him get away. I think that's pretty ambiguous. I think they cut, they slashed his tires so he wouldn't run away and drive away. Right, exactly. These guys weren't, weren't the, weren't walking. How could he do it if he was dead? I'm sorry? How could he run away if he was dead? He wasn't going to be dead immediately. I'm sorry? He wasn't dead when they first walked in. You've, you've, I think you put your finger on an inconsistency in the logic of the defendants, but I don't think it really attacks the fact that all three of them admitted that they planned from the beginning to kill him. They, they knew he, that he knew them by sight. They worked there. They had no disguises. They had no getaway plan whatsoever. It was clear as they confessed to the police, we intended all along to kill the guy. And our, the whole prosecution thrust was, if they knew that they had to kill the guy, Jennings knew they had, he had to kill the guy because they were all full partners. They all did everything together. They were together all day, every day. Tipton said, yeah, I heard them talking about this. I knew it in advance. Appellant confessed afterwards. Who confessed afterwards? Appellant. He confessed to his two, to two, three separate women from jail. He said, I didn't mean to kill him. He said that, yes. Right. But he was there. He, he had to have intended to kill them because he had to know that they couldn't get away with it without, without having to. Were, were those statements, the confessions that I was there and things went wrong or things went bad or however he expressed it, would those have been sufficient to support the felony murder without any further evidence of his state of mind? Without any further evidence or with the evidence that I've told you? With the circumstantial, leaving aside the challenged statements of the co-defendants, leaving the, the things that were in dispute about the confrontation clause, his statements that you've talked about to the women and the circumstantial evidence that wouldn't be covered by the confrontation clause, would that be sufficient? Well, there are three categories of evidence. There was his confessions that said that I went there to rob. There was the fact that the circumstantial evidence showed that he knew whatever the other three guys knew because they were a team. Anything they knew, he knew. And then there were the parts of the confessions that unquestionably come in because they were wholly inculpatory only to the confessors, such as we planned and such as we lay in wait for an hour in the car waiting for the cleaning crew to leave, and then we went in and Matt, Matt left the parts of the confessions that, that were wanted in by the defense. We went into the building. Matt got cold feet and left. That shows that he was there. He was in on the planning. He, he must have known that they had knives. He must have known that they had nail pullers and, and heavy metal equipment to kill and duct tape to kill Madden with. He must have known that his cohorts knew Madden and Madden knew them, so that it would have to kill him. There was more than enough evidence to show that he knew what was going on. He knew what was going on. The whole defense argument here is he didn't know what was going on. All the evidence was that he was a full member of this gang of four. He knew everything they knew. He was a leader of the gang. He knew they had confused knives and duct tape and. He doesn't have to be the leader for any of this to work, does he? Absolutely not. It's just circumstantial evidence that he must have known. But, but also the leader of the gang is sort of general testimony that these guys hang out together and he's the leader. But there was no evidence that he was the leader of this. In fact, the evidence seemed to be that he wasn't and that the other two guys who, who worked there. They came up with the idea. I'm sorry, what? They came up with the idea because they saw the money. Right. But, but everything. So, I mean, that's just very vague general stuff saying in general he's, he's the leader of this group. There was no evidence that he was the leader of this. He was in on this because. That's different. But you, you said that he was the leader of the gang. I said he was a leader of this group. It's not that he was a passive guy. The fifth guy, Rackley, he was their, their junior partner. He, he was a tag along. He didn't know everything. Maybe they didn't tell him all their secrets. These four guys, everybody that knew them, the girlfriends, the mother of the girlfriend, people that hung out at the flop house, everybody said they talked about everything together. They were a group. They were tight. They broke into the cabin in the hills above San Jose and lived there for a week, trashed the place. They committed the robbery where they stole the stun gun together. They bought cars the day afterwards with the loot. Splitting the loot, they all went out and bought cars together. Everything they did, they did together. The circumstantial inference is that there's no way that if these two guys, these three guys, his best buddies are about to commit a robbery and murder this guy, that they're not going to tell him, hey, oh, by the way, we have to murder him because he's going to recognize us because we worked for him. Thank you, counsel. You've exceeded your time, and we understand your concern. Thank you very much, Your Honor. Ms. LaTorte will give you a minute for rebuttal if you want it, even though you used your time since we let opposing counsel go over his. Maybe just a quick comment that before the trial, I guess there was some heavy litigation in regards to severing the defendants, the co-defendants, and I think that was a brutal motion, and it seems like although they won the motion, for some reason, they were able to bring in everything that they shouldn't have brought in to begin with. That was the reason they did the brutal motion is to sever the cases. So it just seems that all the evidence that came in should not have come in, and it just seemed like an accumulation of errors that occurred that just makes it that I think Mr. Jenning needs some type of relief. Thank you, counsel. The case just argued is submitted, and we appreciate both counsel's arguments.
judges: Alarcon, Graber, Berzon